CERTIFIED GROCERS OF ILLINOIS, INC., Plaintiff-Appellant, v. HODGKINS PROPERTIES, INC., *et al.*, Defendants-Appellees (The Austin Company, Defendant).

First District (1st Division)   Nos. 85—0965, 85—1654 cons.

Opinion filed June 16, 1986.

Rudnick & Wolfe, of Chicago (John K. Kallman, of counsel), for appellant.

Mayer, Brown & Platt, of Chicago (Robert J. Kriss, of counsel), for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Certified Grocers, appeals from the trial court's orders

granting defendants' motion for summary judgment on counts I, II and V of plaintiff's second amended complaint, and striking plaintiff's affidavit submitted in opposition to that motion. We affirm.

A detailed recitation of the facts is necessary to an understanding of the orders now before this court. In May 1977, defendant Hodgkins Properties, Inc. (Hodgkins), sold a large warehouse facility to Certified. The warehouse had been constructed between 1974 and 1975 by defendant Austin Company. Hodgkins was a wholly owned subsidiary of defendant George Weston, Inc. (GWI), which was a wholly owned subsidiary of George Weston Limited (GWL). All three companies, collectively referred to as the Hodgkins Group, were parties to the real estate contract. As part of the transaction, Hodgkins assigned its rights under a written construction contract with defendant Austin to plaintiff. At the time of closing, the parties entered into an amended agreement containing a limited indemnification clause which was necessitated by Hodgkins' inability to provide Certified at that time with an engineer's certificate, signed by Austin, representing to Certified that the construction of the warehouse was fully completed in a first class, workmanlike manner in accordance with plans and specifications. Under the amended agreement, Hodgkins was to indemnify and hold Certified harmless from and against any loss, damage or costs which Certified might sustain by reason of not having obtained the proposed certificate from Austin as provided for in the original sales contract. As further inducement, GWI and GWL agreed to indemnify Certified against any loss, damage or expense that Certified might sustain as a result of any misrepresentation or breach of warranty by Hodgkins with respect to the foregoing agreement.

Although Certified claims that prior to and immediately after closing, it knew that the warehouse roof leaked profusely, it did not give notice to Hodgkins of any claim related to the roof until April of 1982, at which time Certified brought suit against defendant Austin for misrepresentation, and against the Hodgkins Group under the limited indemnification agreement. In its original complaint, Certified alleged having expended $114,000 for repairs to the roof.

Certified served no discovery requests on defendants from April 1982 to March 1984. At that time, Certified filed an amended complaint in which it withdrew its indemnification claim against the Hodgkins Group and asserted, for the first time, a claim against Hodgkins under a provision of the original sales contract whereby Hodgkins agreed to maintain all real, personal and leased property free from waste and neglect and in good repair from the date of the sales agreement in March 1977 to and including the date of closing in

May of 1977. Thus, Hodgkins had no notice until March of 1984 of a claim arising from events allegedly occurring in 1977.

In September 1984, over two years after suit was commenced, Certified first served interrogatories and a document request on defendants. Certified filed no notices of deposition from 1982 through 1984.

During the course of discovery, the Hodgkins Group deposed Certified's president, Wendell Smith, who had authorized the filing of the instant lawsuit, and its director of engineering, Edward Ludwig, who was responsible for the roof and for working with Raymond Norton, a roofing consultant and Certified's outside expert. According to Ludwig, Norton had been retained by Certified in 1978 and had examined the roof periodically from 1978 on. Neither Smith nor Ludwig was able to testify as to any basis for believing that the actions of the Hodgkins Group were responsible for the damages being sought by Certified under its maintenance claim.

In its answers to interrogatories, Certified claimed to have performed no maintenance or repairs on the warehouse roof from the date of closing until December 1981. From December 1981 through March 1984, however, without any notice to Hodgkins, Certified made repairs to the roof costing approximately $400,000 and substantially altering the roof's condition.

In November 1984, after Hodgkins had completed deposing all of Certified's witnesses, Certified moved for leave to file its second amended complaint, in which it reinstated its indemnification claims against Hodgkins and against GWI and GWL (counts I and II respectively), continued its maintenance claim against Hodgkins (count V), and sought damages for repairs to the roof in an amount exceeding $400,000.

In January 1985, the Hodgkins Group moved for summary judgment on counts I, II and V, on the basis of waiver, estoppel and *laches*, and also sought to dismiss counts I and II for failure to state a claim. In addition to the deposition excerpts of Smith and Ludwig, Hodgkins filed excerpts from the deposition from Kenneth Reiser, its former employee, in support of its motion. Prior to closing, Reiser had been responsible for maintenance of the roof. After that time, he began working for plaintiff, where he remained until June of 1979. Reiser testified that plaintiff had first inspected the roof on February 2, 1977, prior to signing the sales agreement on March 9, 1977, and had reinspected the roof numerous times between signing and the time of closing in May. Reiser stated unequivocally that the condition of the roof was the same on the date of closing as it was in February

1977. In addition, Hodgkins claimed that pursuant to the construction contract that was assigned to plaintiff at closing, the roof was under a two-year guaranty which remained in effect until August 26, 1977, three months after closing, and that plaintiff's seven-year silence had caused it to lose the benefit of that guaranty from the party that had constructed the roof.

Certified filed no response or counteraffidavits to oppose the motion for summary judgment either prior to or at the hearing which was had on January 10, 1985. However, two days prior to the hearing, Certified served a motion to compel discovery. This motion was presented at the hearing, after which the trial court made the following observations: that the instant case had been on file for 34 months; that no objections to the movant's response to discovery requests had ever been made up until the time that defendants moved for summary judgment, and that although discovery was closed under the circuit court rules, plaintiff had failed to make a timely request for an extension. The court then denied plaintiff's motion to compel insofar as it was being used to delay the hearing on summary judgment on the issue of maintenance raised in count V.

Certified then requested permission to respond in writing to the motion for summary judgment which was denied; however, the court inquired as to whether, if given the opportunity to respond, plaintiff could raise an issue of fact as to the maintenance count. Plaintiff replied that its response would be entirely as to questions of law. The trial court determined that all questions of law could be argued presently. The court then, while noting that plaintiff had no "absolute" right to do so, allowed plaintiff's counsel to rely on the deposition testimony of Kenneth Reiser which stated that the warehouse roof leaked severely prior to the sales agreement in March 1977. Plaintiff was also granted leave to file excerpts from the Reiser deposition. At the conclusion of arguments, the court stated that it was ready to say without embarrassment that plaintiff's failure to complain about a leaking roof for five years after the time of closing constituted waiver as a matter of law. Counsel for plaintiff submitted that under Illinois law, actions alone could not constitute waiver and that express waiver was absent in this case. Based on this argument, the court agreed to take the case under advisement for seven days, stating that summary judgment on the issue of maintenance would be granted unless plaintiff could supply it with cases stating that the waiver had to be express. The court then ordered that the motion for summary judgment as to counts I and II would not be heard until the motions to dismiss those counts had been properly disposed of.

A week later, Certified filed its response to Hodgkins' motion for summary judgment in which it argued, for the very first time, that waiver could not have occurred because the defects now being complained of were latent defects. Plaintiff filed the affidavit of its expert, Ray Norton, in support of its latent-defect theory.

On February 28, 1985, the trial court struck Nortons affidavit and other deposition excerpts filed by plaintiff which did not comply with the limited permission to respond granted on January 10. The court then granted summary judgment as to counts I and V on the basis of waiver, relying only on those pleadings and exhibits filed by the movant and that portion of the Reiser deposition which plaintiff had been granted leave to file. In its memorandum opinion, the court enumerated the following facts which led to its conclusion: that plaintiff had inspected the facility numerous times, visiting the premises almost daily in March of 1977, and had inspected the premises shortly before closing; that the number of leaks in the warehouse roof had increased during 1977, and from 9 to 11 drains were leaking at the time plaintiff took possession; that at the time of closing, plaintiff had accepted the assignment of the Austin contract, which provided for a two-year guaranty on the roof, from defendants; that in spite of the knowledge of the leaks before, at the time of, and after closing, plaintiff made no claim under the guaranty; that plaintiff retained a roofing expert in 1978 to determine the cause of the leaks; that work was performed on the roof by various companies, consisting of inspection, opinion, recommendations and monitoring installation as early as October 1982 and that no evidence of any complaint by plaintiff during that period was competently in the record, nor did plaintiff give defendant notice of the alleged cause to allow defendant to inspect nor did plaintiff demand repair of the roof prior to its filing claims in 1982 and 1984 for in excess of $400,000.

Plaintiff's motion for reconsideration, which was fully briefed, was subsequently denied in a memorandum opinion filed March 1985.

On May 29, 1985, a hearing was had on defendants GWI and GWL's refiled motion for summary judgment on count II. In response, plaintiff refiled the previously stricken affidavit of Ray Norton to support its latent-defect theory. During a hearing on the motion, the trial court expressed its opinion that if no material issue of fact existed as to count I against Hodgkins, the same would hold true as to these defendants because the same alleged breach of contract—the failure to deliver an engineer's certificate addressed to plaintiff in 1979—was at issue in both counts. Plaintiff argued that because leave to file materials in opposition to the summary judgment

motion had been specifically limited during the January 10 hearing as to count V only, and there had been no similar orders entered with respect to the remaining counts I and II, the Norton affidavit and other exhibits were now properly before the court to create an issue of fact precluding summary judgment. The trial court rejected plaintiff's argument, and for the reasons previously set forth in its two memorandum opinions, granted summary judgment as to count II on the basis of waiver.

Plaintiff concedes that if the Norton affidavit were properly stricken by the trial court, summary judgment as to all three counts would have been properly granted. It contends, however, that the trial court abused its discretion in striking the affidavit, which created a material issue of fact as to all three counts, that the court, after continuing briefing and argument with respect to counts I and II, incorrectly granted summary judgment as to count I on February 28, 1985, without giving plaintiff additional opportunity to respond, and incorrectly struck the same affidavit which was refiled in response to defendants' motion on count II, some five months later. Given the burdensome history of this litigation, and the amount of time during which plaintiff failed to give defendants any notice of the very substantial claims it now urges this court to recognize, we find little merit in plaintiff's contentions.

■ Most compelling to our decision is, we believe, the fact that plaintiff took no discovery for over two years after filing its complaint, and presented no evidence to oppose the entry of summary judgment as to any counts as late as January 10, 1985, which, as the trial court noted, was 34 months after the filing of the instant lawsuit and nearly 8 years after plaintiff had taken possession of the subject property. Despite plaintiff's failure to respond to defendants' motion at or before that time, the trial court made a concerted effort during the hearing to ascertain whether a triable issue of fact existed which would preclude the granting of summary judgment. Plaintiff failed to indicate any such facts, however. In arguing defendant Hodgkins' duty to repair the roof, plaintiff necessarily took the position that the defects complained of were apparent and known to defendant before and at the time of closing. Then, only after the parties had fully argued the merits as to count V and it was quite clear that the trial court would grant summary judgment based on waiver, did plaintiff first present its expert's affidavit which, it submitted, supported a totally new theory of latent defects, making waiver inapplicable as to any count. Under these circumstances, we cannot say that the summary striking of plaintiff's unauthorized exhibits constituted abuse of

discretion. See *Tezak v. Cooper* (1960), 24 Ill. App. 2d 356, 164 N.E.2d 493.

■ We agree with the trial court that plaintiff should be estopped and with its reasoning that the relevant time for triggering plaintiff's responsibility to give at least some notice of its potential claims against defendants was at the time when evidence of the alleged breach was first discovered, and not, as plaintiff contends, only after all of the effects of the breach had become known. There is compelling policy behind our holding, which is to encourage finality in real estate transactions; to hold otherwise in the instant situation would result in defendant-sellers being charged with a failure to repair a roof in 1977 without having had the opportunity to view the roof, to investigate and to contest claims at a time close to when their responsibility was in effect. The conclusion urged by plaintiff would in effect place an unwitting seller at the mercy of his buyer indefinitely.

In addition, we find that the court's granting of summary judgment on count I was not improper, based on the exhibits before it at the January 10 hearing and those other exhibits which plaintiff was given leave to file at that time. Finally, we find no support for plaintiff's apparent claim that it could, as a matter of right, file the same exhibits that were previously disallowed in response to a portion of the identical motion that was filed five months earlier.

Finally, we believe that a necessary purpose behind section 2—1005(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c)), which requires parties opposing summary judgment to file counteraffidavits prior to or at the time of hearing, is to deter parties, such as plaintiff here, from "tailoring" affidavits and from bringing incomplete procedures before the trial court.

Based on the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINLAN, P.J., and BUCKLEY, J., concur.